The next case today is Northeast Patients Group et al. versus United Cannabis Patients and Caregivers of Maine. Appeal number 211719 and Northeast Patients Group et al. versus Kirsten Figueroa. Appeal number 21-1759. Attorney Taub, please introduce yourself for the record and proceed with your argument. Good morning, your honors. My name is Chris Taub, counsel for the Supreme Court or any Court of Appeals has ever considered. To what extent does the Dormant Commerce Clause apply to a market that Congress has made illegal? Here, the market is medical marijuana and Congress, through the enactment of the Controlled Substances Act, has unequivocally made both interstate and interstate markets in marijuana, medical or otherwise, illegal. The novel question that's presented by this case should be answered by looking at the purpose of the Dormant Commerce Clause and then considering whether that purpose would be advanced by applying Dormant Commerce Clause principles to Maine's interstate medical marijuana market. The purpose of the Dormant Commerce Clause is to preserve a national market for competition and prevent states from setting up protectionist or other measures that would impede fair trade. Importantly, and as the Supreme Court has recognized, the Dormant Commerce Clause protects the national market, not particular entities that might operate in the market. In other words, its purpose is to protect open markets, not protect individual market participants from discrimination. So, applying the Dormant Commerce Clause here would not advance its purpose of ensuring a free and open market because Congress has declared that any market in marijuana is illegal. The Dormant Commerce Clause simply has no application in this context. If anything, by limiting the scope of the market by preventing out-of-state investment, the residency requirement is consistent with Congress's objective of deterring a marijuana market. In sum, the Dormant Commerce Clause does not apply here and plaintiff's challenge fails. And with that, I'd be happy to try to address any questions that the court may have. Well, one question is whether we imagine Congress to be blind to the reality of the existence of an illegal market and, therefore, to be blessing discrimination by states within it when it bans it, but also, as you know well, bans it in a somewhat complicated way. Excuse me, Judge Barron, we may have lost Judge Helpy. I think he's left the meeting, so if we could just... Let's pause them for a second. Thank you. So, we can proceed from wherever we left off. Thank you. Okay, Mr. Taub, do you want to pick up and if you want to rewind 30 seconds to where you last were, go ahead. Yeah, I'm not completely sure when we lost Judge Helpy, but I'll just say very briefly to sort of reiterate my basic points, which were a Supreme Court, another Supreme Court, another First Circuit, or any court of appeals has addressed the issue of the extent to which the Dormant Commerce Clause applies to a market in a product that's illegal under federal law, that what the court should do is look to the purpose and function of the Dormant Commerce Clause. And the purpose of the Dormant Commerce Clause is not to protect individual entities from discrimination, but to protect an open market, an open and free market. In this case, Congress, through the Controlled Substance Act, has declared that there is to be no market in marijuana. And so, for that reason, it would make no sense to apply the Dormant Commerce Clause to a market that Congress has declared unlawful. And I'll stop there, Your Honors, and I think, Judge Barron, you were asking a question. Yeah, well, I guess it's really, I guess there's two points or three points that I'd like you to address. One is the relevance of the Rohrabacher Amendment to your argument. Two is, and I guess two and three are related to one another. We know from Raich that in one sense, even though there is a prohibited market, there is a market in a common sense sense of the term. People are buying and selling marijuana. So I guess the third point is the point you're trying to rest your case on is a point about sort of the purpose of the constitutional interest in protecting open markets. And I'm trying to figure out whether you're saying we know from Congress's legislation that it's endorsing your view, or whether you're saying we don't know from Congress's legislation whether it is. But in the face of that silence, the default should be states can discriminate in the illegal market. So I think I understand those questions. And I think the answer is that our view is Congress has not been silent when it comes to marijuana. Congress, through the Controlled Substances Act and putting enlisting marijuana as a Schedule 1 substance, has declared that there is to be no market, intrastate or interstate, in marijuana. But I guess I was asking something slightly different, which is we also know from Raich that Congress understands that despite its legislation, there in fact is a market. And with respect to the market that exists, notwithstanding the legislation, I don't see anything that indicates Congress has stated a view one way or another about whether there can be discrimination by states with respect to that market. I don't take it you to be arguing otherwise. Yes, Your Honor. So I think this may go to the argument that there has to be some sort of clear and unequivocal statement from Congress that states can engage in a particular course of conduct. And so I think, and correct me if I'm wrong, but I think what you're suggesting is, is there some place where Congress has said states can discriminate when it comes to marijuana because we've declared there to not be a marijuana market or is there something in a federal law that we can point to? And our response to that is it would make no sense for Congress, on the one hand, to declare there is to be no marijuana market, full stop, but then if you're going to create your own marijuana markets, you can't discriminate against out-of-state interests. Well, then how does the Warbacher Amendment figure into that observation on your point? What else would the Warbacher Amendment be doing other than recognizing the existence of an interstate market? So it definitely recognizes the existence, and clearly Congress is aware that there is an illegal market in marijuana going on out there. But it's also, not only is it aware that there's an illegal market, it's aware that it doesn't want to prosecute people federally for it. Congress could, if what Congress wanted to do is to create a legal market in marijuana, it knows how to do that. It could simply amend the control substance. Yeah, no, I, just last turn on it, but I guess I'm getting at is, you're right to say this is a novel question. I mean, it's a, you couldn't make up the question. The, and you're right to identify what the constitutional interests are. What I'm trying to get at is, one particularly good actor at figuring out whether there's a market, how much it should be regulated, how much states can participate in it, how they should treat each other when they participate in it, is Congress. Well, what we know about Congress here is that they haven't spoken to the discrimination question. They have spoken to the existence of the moral question, and maybe in a different case in which they were unrelenting and zealous in trying to stamp out the market. Your arguments, we might assume, could have force, but why would we be willing to substitute our judgment for Congress's and the presumption that we attribute to Congress in a situation where they haven't been zealous in that way, as evidenced by the because the issue is not how zealous Congress has been. The Warbucker Amendment is not legalization of marijuana. It's simply Congress saying that there are limited federal resources available for the prosecution of crimes, and we've decided as a policy matter that we don't want limited state discrimination in commerce. It is a kind of free trade consumerist interest, but another is a national interest in comedy and interstate relations, which Congress has an interest in. Given the history of the country and the friction between states and the dangers that can arise from friction between states, there would seem to be an independent interest that the former Commerce Clause protects in harmonious relationships between states and deference to the federal government's power to control the national market. I don't see why those sets of interests aren't implicated by interstate discrimination in this market when at least when all evidence is Congress is aware of the existence of that market. They could easily step in to tell us something about whether they should discriminate or can't discriminate, and they haven't done so. I am not aware of a case that has suggested that the Dormant Commerce Clause or the Commerce Clause, that one of its purposes is to promote sort of comedy and good relations among states. I think there are other parts of the Constitution that have that. There are provisions in the Constitution that go to that. For example, someone could bring a privileges and immunities claim, perhaps. That's the exact argument that was rejected in Tennessee Whiskey. It is true that there were other provisions, but those were construed not to apply to the concern that the Dormant Commerce Clause uniquely has been understood to apply. That's why in Tennessee Whiskey, they reaffirmed the application of the Dormant Commerce Clause despite the objections that it's the wrong cause to look to. I guess all I can say is that the Supreme Court has been fairly clear on what the purpose of the Dormant Commerce Clause is, and it's really about promoting open and free trade and not allowing states to operate protectionist-type policies that are going to interfere with that. To that extent, there is this aspect of comedy or state relations involved, but all of that presupposes that there is a legal market. When Congress has said, we don't want there to be a market at all, it really would not make sense that Congress would at the same time have concerns about how states are operating in this market that Congress has declared illegal. Mr. Todd, there's some great irony in your saying the market is illegal when your state, Maine, along with 33 other states, has chosen to enter the market and not only to enter the market but to regulate the market and to regulate the market in a way that discriminates against non-residents of Maine. That's a kind of basic flaw in the approach here. I guess my response to that, Your Honor, is I'm not going to dispute your characterization of this being ironic, but I think the point is not whether this is fair or not or whether this seems equitable, but the issue is, is it a violation of the Commerce Clause? No. You're asking us to read Congress's intent to be that there should be no market while Maine is busy exploiting the market. That's enough. Thank you. I just have one question. Can you hear me? Yes. Yes. My question is, and this is just basically a yes or no question, there's no question that if this Maine law did not deal with marijuana, if it dealt with anything that's legal under federal and state law, it would violate the U.S. Constitution, correct? Probably. It would trigger a stricter scrutiny and we'd have to survive that. Maine did survive that at least one time in the bait fish case, but to answer your question, it would be much more difficult if this was not an illegal product. Our only argument in this case is that the Dormant Commerce Clause does not apply because this is not a legal product under federal law. Just to nail that point down, if we reject the argument you are making to us, you're not suggesting there's any ground for remand for then consideration of the scrutiny. Either you win on this argument or it's bust. We've read the applicable cases and we would not be able to survive that test. And just one really quick follow-up to my question. You don't dispute that this is protectionist legislation, correct? That seems to be what the intent behind it was, correct, to promote local business. Okay, thank you. Thank you, Mr. Taub. At this time, please mute your audio and video. Attorney Monteleone, please introduce yourself on the record to begin. Good morning, Your Honors. James Monteleone for Appellants United Cannabis Patients and Caregivers of Maine. To tail right on the conversation that was left off. Importantly, the expectation of action under the Commerce Clause does not require Congress to restate its intent year after year after year. It did so when it adopted the Controlled Substance Act. If Congress, with full knowledge of whatever is happening in many states and isolated markets in different states, had the desire to change its standing word on the subject, it has the ability and knowledge how to do that. Yes, and counsel, isn't it true that there's legislation in the Congress? And so what you're asking us to do is, by judicial fiat, attribute to Congress a fixed intent, despite the fact that Congress never said in that that, by the way, to the extent there is a market, we think it's perfectly okay for states to discriminate against residents of other states. You seem to be in a world that is static and requires Congress to act in the face of changing circumstances, and Congress has given indication that it is aware of that. If the Rohrbach-Farr Amendment were to reflect the changing circumstances, it would have done so in stronger terms, in actually changing the market. Isn't the whole idea of the Dormer Commerce Clause that rather than guess about what Congress would have done with respect to interstate discrimination, we just wait for them to tell? Yes, and Congress has told this court, as the Supreme Court found in Gonzales v. Reich, it's comprehensive, and the CSA has not changed since Gonzales v. Reich was decided. No one's suggesting that we be reading the Dormer Commerce Clause to suggest that federal law now makes it legal to engage in the market. The question is, when they make it illegal to engage in the market at the national level, are they also saying the residual market that inevitably exists in the shadows is something that states can engage in through interstate discrimination? What indication is there that Congress is sending that signal? It's the well established precedent that illegal conduct, contraband, has no protection within the Constitution. The Constitution does not reach that far. But the thing that's being restrained is the state action regulating commerce, which I had understood the precedents to suggest is a constitutional concept. We know something is commerce because it's happening, not because the state or the federal government labels it as such. It just is commerce. In fact, that seems to be the underlying premise and range. That's actually to the contrary. In Iowa v. Predka, the court found that there can't be a Commerce Clause right in contraband. So it's not that, oh, if it's commerce, then therefore it opens up the door. It has to be a national common market, which doesn't exist here. What we have is 33 isolated silo markets over which product does not cross state lines without violating federal law. So we don't have the common market. Additionally, we don't have... Why are you discriminating? Frankly, Your Honor, it is possible for the executive branch of the government to change its policy and come in and wipe out Maine's market entirely. And what's happening in the meantime is a local policy that does not reach a regulation or inference or impedance on interstate commerce. We have a decision that's about a month old about the Rohrabach Amendment that says federal the state regulatory structure. And implicit in that holding is a recognition that Congress understands there is this national marketplace, whatever the titular prohibitions, and wants to that says Congress intends to let the states discriminate against residents of other states. But it did not do that. As the Supreme Court noted in South Dakota Wayfair, when regulation, when Congress has spoken, the regulation controls. It has regulated through absolute prohibitions. Your reference was to the executive branch. We have been talking about what Congress intended. So why was there a reference to the executive branch? The reference to the executive branch is that the executive branch is the discretionary actor. Congress need not change anything, not a single word on the page in the CSA to wipe out Maine's market. All that needs to change is the discretionary executive branch priorities and whether or not to enforce that. That's not true after the Rohrabacher Amendment. That's correct. It's but the Rohrabacher Amendment is a one-year renewal. So in every past year, this is the year we're in. Understand. And with that said, this court in Bilbao noted that it's not a repeal of the CSA. The CSA is in effect, and we're going to apply the state regulation. You agree that if Congress passed a statute that said there can be no interstate discrimination in the medical marijuana market, notwithstanding that it's illegal, we would enforce that, correct? Correct. That would require an amendment of the CSA. You wouldn't say they lack the commerce power to regulate that illegal market, even though they've made it illegal, would you? No. Okay. So obviously that must mean that market is a market for commerce clause purposes, notwithstanding a statute that stamps it out. And that being the case, why wouldn't we then conclude that the Dormant Commerce Clause equally is applicable there? And whatever, there may be questions at the margin about, you know, an incidental burden case maybe looks different when Congress has made the market illegal. This is on its face discrimination against out-of-state residents participation in the market flat out. So that's a very easy case. So insofar as the Dormant Commerce Clause has any application, this will be the kind of case, which is no doubt why Maine is making only one argument. But if you concede that Congress would have the commerce clause power to impose the rule that would be adopted by the Dormant Commerce Clause, that must be because there is an interstate commerce market for purposes of the Constitution, notwithstanding the statutory prohibition against that market. And Raich supports that conclusion. I disagree, Your Honor. Raich says that the prior illegal market was the reasonable basis for the for Congress to regulate interstate activity, not for it to acknowledge that these two markets live in harmony. Thereon, the CSA has eliminated any manner of interstate market. And what exists in its wake is siloed intrastate markets that aren't protected by that international common market. Okay. Thank you. Judge Helpe, did you have any questions? No, thank you. They've been asked by all of you. Thank you. Thank you. Thank you. Thank you, Attorney Monteleone. You can mute your device at this time. Chief Judge Barron, my understanding is that Judge Helpe's internet has come back and that he would find it helpful if he could rejoin via Teams. If it's okay with you, let's pause the stream and see how it goes when he comes back in. Thank you. Attorney Warner, if you could introduce yourself on the record to begin. Yes, good morning. My name is Matt Warner. I represent the appellees in this case. And may it please the court, Mr. Taub and I agree that this case is novel. And we agree that the purpose and function of the Commerce Clause is central to the analysis. But I'm afraid that is where our analysis diverges. The purpose of the Dormant Commerce Clause, which I'll just touch on briefly because it was addressed earlier, the Supreme Court has made clear most recently in Tennessee wine, but also in cases like Hughes v. Oklahoma, where the court reminded us that the Commerce Clause is designed to prevent the tendencies toward economic balkanization that plagued the and when they were colonies. The function of the Commerce Clause, then the framers answer to that problem was to curtail state authority over commerce and give Congress the exclusive authority over interstate commerce and commerce in our nation. The way this works is that states do not have the authority to burden interstate commerce, unless Congress through unmistakably clear language grants them this authority. And at that point, with that analysis is where we jump to the Controlled Substances Act and consider what Congress has said in this space. The Controlled Substances Act does not say in unmistakably clear language or any language that states may legalize marijuana and then discriminate against non-residents when doing so. The Controlled Substances Act, yes, criminalizes marijuana at a national level, but this is different. The Supreme Court has also been clear and my opposing counsel spoke about the policies Congress has in mind and the policy of the Controlled Substances Act. The Supreme Court has been clear in cases like Wannick from 1984, that the mere fact that a state law is consistent with federal policy, or even further as goals Congress had in mind with that policy, is not enough to give states the authority they do not otherwise have under our Constitution to burden interstate commerce. I think it's also worth considering that the Controlled Substances Act, enacted in 1970, was enacted far before the current landscape existed. At least 30 years before any state had legalized, or nearly 30 years before any state had legalized medical marijuana in any form, and more than 40 years before the current landscape where dozens of states have legalized medical marijuana and there is a massive multi-billion dollar nationwide market in marijuana investment. Congress could not possibly have had in mind with the language in the Controlled Substances Act, could not possibly have intended with the authority to burden interstate commerce in the way Maine is doing here. The Roebucker-Farr Amendment is most notable to this case for what it does not say, which once again, it does not give states that explicit grant of authority, or unmistakably clear grant of authority to burden interstate commerce. With that, I think it would be most useful if I can answer any questions the court may have. I have just one. Okay, let me ask you, this is really a yes or no answer. Would your result, under your theory, be the same, let's say if the state of Maine were to legalize tomorrow heroin, cocaine, meth, fentanyl, it would be the same result, correct? I'm hesitant to defy your directive and give something other than a yes or no answer, and I'm afraid I have two parts to my response. The first is that yes, all else being the same, the result would be the same, because the Controlled Substances Act, of course, does not give states the authority to discriminate against non-residents in the context of other drugs either, or for that matter, in the context of marijuana itself. And I just want to point out this case is about marijuana investment, not marijuana, and if that distinction matters, I don't know. But the second part to my question is that all else is not equal here, and that is given the differences in the national markets for marijuana or heroin or any other type of drug banned by the Controlled Substances Act. Okay, but if tomorrow there were a national market for, let's say, opium, and 30 whatever states make it legal, the federal government doesn't, but at least you wouldn't be arguing for the same result, am I correct? Well, I think that there is a difference between investment dollars and the drug itself, and that difference is where I think a case cited by the state and the caregivers, General Motors v. Tracy, is perhaps most relevant to this case. And that is because if a state law banning the import or export of marijuana or heroin were struck down by a court, it would not serve competition given the current dynamics in our national market. The federal government would continue to prohibit and enforce the movement of those drugs across state lines, and there would be no additional competition served as a result of that type of judicial decision. That is very different here, where plainly there is a massive interstate market in marijuana investment dollars, and if Maine's statute did not exist and were struck down, competition would immediately be served between non-resident and resident investors. The national interest is created by the many states in this case, correct? Not the federal government. It's created by the state. I'm sorry, the national interest in the commerce. Yes, in marijuana. So, this interest is created, you know, this market is created by the state, not by the federal government, correct? Yes. Okay, thank you. No more questions. Judge Barron, if I might. There are several aspects of the Maine statute which appear to have different rules for residents and non-residents. This case involves only who may own dispensaries and the injunctive relief issued here is limited to that. Is that correct? Yes, that is our client's interest. And your clients, one is a corporate entity that wants to buy the corporate entity made up of Maine residents, which owns several of the dispensaries. There's an oddity in the Maine statute in which it refers to managers and others with ownership interests, and it seems to limit shareholders with ownership interests. I thought shareholders by definition had ownership interests. So, I began wondering whether, given the burgeoning market, whether the SEC is doing anything, whether there are any particular concerns that the SEC has gotten into. It's not particularly relevant to this case. I was just curious if there's going to be kind of a national shareholder market. Well, Your Honor, the SEC involvement I can speak to is simply the fact that a number of companies, including the parent company of High Street Capital Partners, are publicly traded on exchanges in the U.S. that are regulated by the SEC. Beyond that, I can't speak to what the SEC's involvement or what they may have spoken to here. Okay, thank you. Could you address the point made by your opponents, which is, if I'm understanding it, they're not denying that there is commerce in marijuana, notwithstanding that Congress has made it illegal, but they are contending that because Congress has made it illegal, it's a mistake to treat there being an interstate market because all there is, at most, is individual states making their own state markets. And one thing that I couldn't quite understand from your... So I want you to answer that question, but in doing so, your answer to Judge Helpe's question confused me when you were trying to distinguish between heroin, cocaine, and the marijuana market. And I just didn't quite follow why, from a constitutional perspective, the distinction you were drawing in that regard would matter. I could see a distinction that would tie the marijuana case being different because of the Rohrabacher Amendment, which doesn't exist for those other drugs, but I didn't quite understand why the way investors operate could have anything to do with the constitutional question of whether there's an interstate market. So that's a lot, but I guess the two pieces of it are, could you just address this question about how can there be an interstate market, even though, obviously, there's exchange in the market for marijuana, given Congress's prohibition of the market? And then secondly, in answering that, just help me understand your answer about whether this case is different than a case involving a different drug and why. So in terms of the existence of a national market, again, there are two distinct markets here, one is the market in marijuana. Of course, we know from Reich that there is a national market in marijuana, the Supreme Court noted, albeit a malicious one. In terms of marijuana investment, perhaps under the technical language of the Controlled Substances Act, that market would, too, be illegal, but it is massive, widespread, and regulated by the SEC, among other federal entities. That's sadly true of the illegal market in heroin. It's just that companies that are as seemingly reputable as the cannabis companies claim to be, because they don't have the imprimatur of state regulation behind them, but there's clearly an interstate market in heroin with interstate investors in it. It's an international one. That's true, and the distinction here, of course, to state the obvious, is that states have blessed and regulated and given licenses in this arena. The District Court pointed out that, to kind of rebut the idea that this is 36 or 34 siloed states operating their own markets, that Maine does, in fact, welcome outsiders to participate in this market in any number of ways, both through investment and by actually traveling into the state to purchase marijuana. That's explicit in Maine's statute and in Maine's Ability to Use Marijuana program. Non-residents can, in fact, invest in all businesses. Maybe just one follow-up on the silo point. Even if they were siloed, I guess I'm having trouble understanding how that argument has much force, given the particular restriction we're dealing with, which is a direct prohibition against an out-of-state or participating in the local market, that that only can be a recognition of some interstate dimension to the market or you wouldn't need to prohibit them. I think that's true. I think that what the analysis comes down to is, I guess, what I'll frame as the normal Dormant Commerce Clause analysis, which is, has Congress authorized the restrictive state legislation in play here? A lot of these other facts, though they make it novel, are window dressing to some extent. I guess, when I characterize it that way to address your second question, Judge Barron, Congress has not authorized discriminatory state laws against heroin or methamphetamines or any other type of drug as well. At its core, the Dormant Commerce Clause analysis would be the same at the end of the day. I don't know if it's helpful for you. The point I was making is that there may be some differences based on the Supreme Court's analysis in General Motors v. Tracy, though I think those differences would have to be teased out based on the facts of any particular case. I'm not sure how useful it would be for the Court for me to go down that road again. Thank you. Any further questions? I have one more question. My question is, and I believe this was asked originally by one of my colleagues, but isn't what you're asking, you know, and you asked the District Court, now you're asking this Court to the whole, aren't you asking the judiciary basically to supersede Congress's power to regulate interstate commerce insofar as marijuana? That's my question. My response to that is no, because the default under our Constitution is that Congress has exclusive authority and states cannot discriminate against interstate commerce unless Congress, through clear language, says otherwise. And so in the absence of unmistakably clear language from Congress, what we're asking the Court to do is simply enforce the default rule under the Constitution. So you would be arguing that, you know, for example, Congress enacting Section 841, and Congress can regulate commerce among the several states and it uses interstate commerce law powers to do so, are you saying that was not a valid exercise of Congressional power under the Congress? Congress's Commerce Clause powers are expansive and one of those powers, one of those powers is the power to alter the, is to expand the power of states to regulate interstate commerce. Congress can hand off some of its power, which is exclusive, to the states if it so chooses. And so while Congress's Commerce Clause powers are expansive and it has, of course, substantial authority beyond this singular power I'm talking about, that's the power that it has exercised in this case with the Controlled Substances Act. Okay, and one last question. I don't think this is, I haven't read it in the briefs, but you are not arguing, nor is anybody here, that there's a fundamental right under the Bill of Rights or any other constitutional provision to sell marijuana, correct? You're basing your argument solely on the Commerce Clause, correct? Yes, Your Honor, our argument is entirely based on the Commerce Clause. Okay, thank you. No more questions from me. Thank you very much. Thank you, Attorney Warner, you can mute your audio and video at this time. Attorney Taub, I believe, has one minute of rebuttal. Thank you. Just to bring this back to sort of the beginning, the basic point of the Dormant Commerce Clause is that it applies when Congress has not itself exercised its own Commerce Clause power to regulate the matter. But when Congress has regulated the matter, then what the court should do is to look at what Congress has said. And here, under the Controlled Substances Act, Congress has said there is to be no market in marijuana. Now, in response to a couple of questions that were asked regarding, you know, basically to the effect of, is it Maine's regime impermissible unless Congress has affirmatively said that states that operate marijuana markets may discriminate against out-of-state interests? And I think what that sort of overlooks is just that would defy common sense. It would defy common sense, and it might result in issues of implied repeal or how to resolve conflicts for Congress, on the one hand, to say there shall not be a market in medical marijuana, and then say, but if you're going to have one, you can't just terminate it. Could Congress pass a provision saying that, let's say they pass the Warbucker Amendment, which acknowledges the existence of state regulation. Could they add a provision to it saying after, let's say we rule your way, could Congress then pass an amendment to the Warbucker Amendment saying, by the way, you cannot discriminate states against out-of-staters in purchasing cannabis companies? Could they pass that statute? I don't know how they could, because the Warbucker Farm Amendment is really just about the allocation of money. When you say you don't know how they could, do you mean that they would lack the constitutional power to pass that? No, I mean, I think there'd be an inherent conflict. It would be like parents going out of town and saying to their kids, don't have a party while we're gone, but if you do have a party, only invite your closest friends. It would create this conflict. Guess what? That's something I might well say, because if you know your children well enough, you know that they might well have the party despite your command. Absolutely, and then what are your children taking from that, which is, hmm, my dad's giving me mixed messages. Maybe he's saying I really can have a party as long as I only invite my closest friends. Well, what do you think they take from the Warbucker Amendment? Well, I think what they take from the state's medical marijuana laws, they're not going to use, they're not going to exercise their discretion, or they're not going to use federal resources to prosecute me. But again, if Congress really wanted to legalize the marijuana market, it knows how to do that. It could amend the CSA to say that marijuana may be permissible if it's done in compliance with the state's medical marijuana program. Last point, I don't see how prohibiting interstate discrimination indicates an interest in legalizing it. It's just an additional restriction. I'm not completely following, Your Honor, but if Congress, on the one hand, is passing a law that says there shall not be a market in marijuana, then... Just because it recognizes it doesn't always get everything it wants, and that when it doesn't, it might need to do some additional things to take care of that reality. Yeah, I mean, I'm probably repeating myself, and I apologize for that, but all I can say is that Congress, through the CSA, has... You're not denying that if Congress were to pass the statute, let's say we ruled your way, and Congress passed a statute saying they can't discriminate, it would have the Congress power to do that, correct? Yes, Congress would have the Commerce Clause power to pass a statute that says states cannot discriminate. Okay, with that being the case, then it's hard to see, and they would have the power to do that even while they were banning the market. It's hard for me, then, to see how that same Commerce Clause doesn't have a dormant aspect that would enforce that in the absence of Congress saying anything. Do you have an answer to that? Well, I think my answer is that to the extent that what's being said is that the only way that Maine can discriminate against out-of-state interests is if Congress affirmatively says they can. That makes no sense, because Congress is not going to say that, because Congress has completely shut off the market. It's made the market illegal, so Maine shouldn't have to wait for an affirmative statement from Congress for something that is illegal. I don't know if that answers your question, Judge Barron. I'm not sure. I understand the argument. Judge Lynch? No further questions. Thank you, both, or all three of you. Thank you. That concludes argument in this case. Attorney Taub, Attorney Monteleone, and Attorney Warner, you should disconnect from the hearing at this time.